#067531

ORIGINAL

FILED
JAN 2 2008
U.S. COURT OF
FEDERAL CLAIMS

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

VITAL RECORDS CONTROL OF
FLORIDA, LLC,

Plaintiff,

vs.

THE UNITED STATES,

Defendant.
_______________________________/

CASE NO.: 08- 5 C

## COMPLAINT

Plaintiff, Vital Records Control of Florida, LLC, by way of Complaint against the United States of America, hereby alleges as follows:

## PARTIES

1. Plaintiff, Vital Records Control of Florida, LLC ("Plaintiff" or "Vital Records") is a limited liability company duly organized pursuant to the laws of the State of Florida with a principal place of business located at 11901 Amedicus Lane, Fort Myers, FL 33907.

2. Defendant is the United States of America, acting by and through the Department of Veterans Affairs, James A. Haley Veterans' Hospital (the "Hospital") located at 13000 Bruce B. Downs Boulevard, Tampa, FL 33612.

## JURISDICTION

3. This Court has jurisdiction pursuant to the Tucker Act, 28 U.S.C. § 1491(a)(1) because of the government Defendant's breach of an express contract between Plaintiff and Defendant consisting of a Service/Lease Agreement for Record/Imaging Services, effective

July 1, 2006 and certain merged documents, including exhibits dated July 1, 2006 and October 1, 2006 (collectively, the "Agreement"). A copy of the Service/Lease Agreement is attached and incorporated hereto as **Exhibit 1**.

4. Plaintiff filed a claim regarding Defendant's breach of the Agreement with the Hospital on or about September 6, 2006. This claim was certified on or about August 8, 2007. The Hospital issued a decision denying Plaintiff's certified claim on or about August 9, 2007. A copy of the Hospital's decision is attached and incorporated hereto as **Exhibit 2**. This case is ripe for action in this Court pursuant to the Contract Disputes Act of 1978, 41 U.S.C. § 409(a)(1).

## STATEMENT OF FACTS

5. Defendant entered into the Agreement with Plaintiff effective July 1, 2006. The Agreement contains a five-year term commencing on July 1, 2006 and continuing through June 30, 2011. The Agreement does not provide for termination prior to the end of the five-year term (that is, prior to June 30, 2011).

6. Pursuant to the terms of the Agreement, Plaintiff agreed to provide Defendant with, among other things, storage space and courier service for hospital and medical records during the term of the Agreement. In exchange for these services, Defendant agreed to pay to Plaintiff a quarterly fee of $10,200.00, payable without demand and in advance monthly installments.

7. The Agreement provides that if Defendant defaults on its obligations under the Agreement, all installments remaining for the term of the Agreement shall, at the option of Plaintiff, immediately become due and payable. The Agreement further provides that in

the event of such a default by Defendant, Defendant shall pay all costs of collection or enforcement of the terms of the Agreement, including reasonable attorney's fees.

8. To meet its long term obligations to Defendant under the Agreement, Plaintiff purchased an additional delivery vehicle and hired an additional courier. Defendant was aware that Plaintiff intended to – and did – take these actions in reliance on Defendant entering into the Agreement with Plaintiff.

9. Plaintiff began performing its obligations under the Agreement on or about July 1, 2006 by providing Defendant with storage space and courier service for Defendant's hospital and medical records. Defendant accepted these services and, from approximately July 1, 2006 through August 24, 2006, made payments to Plaintiff for these services as provided for in the Agreement.

10. On or about August 25, 2006, contrary to the terms of the Agreement, Defendant orally informed Plaintiff that Defendant would be discontinuing its relationship with Plaintiff.

11. At all times relevant to this dispute, Plaintiff satisfactorily and completely performed, or stood ready to perform, its obligations under the Agreement.

12. In breach of the Agreement, Defendant has failed to pay to Plaintiff the fees required under the Agreement since on or about August 25, 2006.

**COUNT I – BREACH OF CONTRACT**

13. Plaintiff repeats and incorporates by reference the allegations contained in paragraphs 1 through 12 of the Complaint as if set forth fully at length herein.

14. Plaintiff and Defendant entered into the Agreement effective July 1, 2006.

15. On information and belief, the Agreement was entered into by an employee of Defendant with express actual authority and/or implied actual authority to do so.

16. Defendant breached the Agreement on or about August 25, 2006, by informing Plaintiff that Defendant would be discontinuing its relationship with Plaintiff and by thereafter refusing to pay to Plaintiff the quarterly fee of $10,200.00 in monthly installments as required by the Agreement.

17. Plaintiff has suffered damages as a direct result of Defendant's breach of contract.

WHEREFORE, Plaintiff respectfully requests that this Court:

(1) enter judgment in Plaintiff's favor against Defendant on Count I of the Complaint;

(2) award Plaintiff damages in the amount of $197,200 pursuant to 28 U.S.C. § 1491;

(3) award Plaintiff interest under the Contract Disputes Act, 41 U.S.C. § 611;

(4) award Plaintiff its attorney's fees and costs of this action and of collecting and/or enforcing the terms of the Agreement; and

(5) award Plaintiff such other relief as this Court deems proper.

**COUNT II -- RATIFICATION**

18. Plaintiff repeats and incorporates by reference the allegations contained in paragraphs 1 through 12 of the Complaint as if set forth fully at length herein.

19. Plaintiff and Defendant entered into the Agreement effective July 1, 2006.

20. Beginning on or about July 1, 2006, Plaintiff provided services to Defendant pursuant to the terms of the Agreement, including providing Defendant with storage space and courier service for Defendant's hospital and medical records.

21. Defendant accepted the benefits of those services provided by Plaintiff.

22. On information and belief, an employee of Defendant with express actual authority and/or implied actual authority to enter into the Agreement was aware of and/or involved in Defendant's acceptance of the benefits of the services provided by Plaintiff, thereby ratifying the terms of the Agreement.

23. Defendant breached the Agreement by informing Plaintiff on or about August 25, 2006 that Defendant would be discontinuing its relationship with Plaintiff and by thereafter refusing to pay to Plaintiff the quarterly fee of $10,200.00 in monthly installments as required by the Agreement.

24. Plaintiff has suffered damages as a direct result of Defendant's breach of contract.

WHEREFORE, Plaintiff respectfully requests that this Court:

(1) enter judgment in Plaintiff's favor against Defendant on Count II of the Complaint;

(2) award Plaintiff damages in the amount of $197,200 pursuant to 28 U.S.C. § 1491;

(3) award Plaintiff interest under the Contract Disputes Act, 41 U.S.C. § 611;

(4) award Plaintiff its attorney's fees and costs of this action and of collecting and/or enforcing the terms of the Agreement; and

(5) award Plaintiff such other relief as this Court deems proper.

Respectfully submitted,

Carl Joseph Coleman
Florida Bar No. 0578207
David C. Potter
Florida Bar No. 0388254
FOWLER WHITE BOGGS BANKER P.A.
P.O. Box 1567
Fort Myers, FL 33902
(239) 334-7892
Fax No: (239) 334-3240
Email: jcoleman@fowlerwhite.com
Attorneys for Plaintiff

Dated: December 27, 2007

EXHIBIT 1

Department of Veterans Affairs
James A. Haley Veterans' Hospital
13000 Bruce B. Downs Boulevard
Tampa FL 33612

August 9, 2007

In Reply Refer To: 673/90C/ELS

Vital Records Control of Florida, LLC.
11901 Amedicus Lane
Ft. Myers, FL 33907

SUBJ: Claim for Service/Lease Agreement for Records Storage

To Whom It May Concern:

*Description of Claim*:

Vital Records Control of Florida, LLC is demanding a buyout for a five year agreement, whereby, they were to provide James A. Haley VA Hospital with Off Site Storage for IT Network Back-Up Secure Tapes and Telecommunications Switch Software.

*Introduction:*

Vital Records Control of Florida, LLC (hereinafter "Vital Records") has retained the services of Fowler White Boggs Banker to represent them in the matter of a breach of agreement. Stated in a letter received from Fowler White Boggs Banker, dated January 30, 2007 and addressed to Karen L. Mulcahy, Esq., Vital Records states the following:

1) The hospital is in breach of the Service/Lease Agreement for Records Storage, effective July 1, 2006. Vital Records also contends that the agreement outlines a five year term in which Vital Records agreed to provide the Veterans Affair (VA) with storage space and courier service for hospital and medical records until the year 2011.

2) Vital Records purchased an additional delivery vehicle and hired an additional courier in order to meet the long term obligation.

3) The hospital agreed to pay a quarterly fee of $10,200.00, payable without demand and in advance monthly installments.

4) The hospital informed Vital Records' courier, orally, that it would be discontinuing its relationship with Vital Records and that the termination was without notice and issued even though the agreement neither provides for nor contemplates termination prior to the end of its term.

5) Vital Records has made severable written requests for the unpaid balances and that the deficiency now exceeds $10,000 and continues to increase.

Vital Records is demanding a buyout of the agreement.

7070060
AUG 1 3 2007

*Findings of Fact*:

A requirement for off site data storage for network tapes and telephone switch software was generated sometime prior to July 1, 2006. Mr. Gregory Brudos, IT Specialist with the Veterans Affairs gave the requirement to Felica Young, Program Support Assistant for Information Resource Management Service to procure with a reference to Vital Records as the contractor.

On July 3, 2006, Felicia Young, Program Support Assistant for Information Resource Management Service at the James A. Haley Veterans Hospital signed and agreement with an effective date of July 1, 2006. The Service/Lease Agreement for Record Storage/Imaging Services is an agreement created by Vital Records. The agreement states that Vital Records will provide storage space and/or imaging services for a period of sixty months from the effective date. It states that the customer shall pay Vital Records rent monthly in advance at a price to be agreed upon based on the volume of items anticipated to be stored as of the date of the agreement and does not specify any amounts.

On July 3, 2006 a form called "EXHIBIT A" was signed by Felicia Young.. This form outlines "Standard Quarterly Fees of $10,200.00 as well as the services that will be provided for the fee. It states that the billing period is from July 1, 2006 through September 30, 2006.

On July 3, 2006 a form called "EXHIBIT A" was signed by Felicia Young. It outlines a "Standard Quarterly Fee of $40,800.00 with the same services outlined on the prior Exhibit A form but with a billing period of October 1, 2006 through September 30, 2007.

On July 26, 2006 a credit card payment was generated for Vital Records, credit card order # Y63636 to pay for invoice # 2085 for a period of service June 26, 2006 through July 30, 2006 in the amount of $1883.04.

On July 26, 2006 a purchase order was generated, Purchase Order # 673-C60921, in the amount of $3467.00 for a period of July 31, 2006 through August 25, 2006 by Sandra Caraballo, Lead Purchasing Agent for Off Site Storage for IT Network Back-Up Secure Tapes and Telecommunications Switch Software. Invoice # 2130 was paid on September 5, 2006 in the amount of $3,400.00 for purchase order 673-C60921. Total Amount paid to Vital Records to date is $5,283.04.

On August 22, 2006 an email was issued from the Deputy Secretary's office to all VHA VISN Directors and Admin Reps requiring immediate action. It referenced two memorandums from the Deputy Secretary. The first memorandum "Handling and Storing of VA Data by Contractors and Subcontractors" included a letter to be mailed to every VA contractor who possesses, handles, or comes into contact with VA sensitive information or personal data. The second memorandum was directing attention to the IT Directive 06-3, Data Security Assessment and Strengthening of Controls, Review of VA Activities that Involve Non-VA employees, dispatched by the Deputy Secretary on August 11, 2006, requiring them to take immediate action

On August 24, 2006, Jose Seymour, Chief, IRM Service, sent an email to Felicia Young addressing the memorandums.

On August 28, 2006 8:20AM, Kimberly Didier sent Felicia an email asking her to call her or Ray and that she was very confused by Friday's events and discussed a level of commitment between the VA and Vital Records referencing 1) a signed 60 month agreement 2) the Two Exhibit A's signed and stated that she mentioned to her from the beginning that they purchased an additional truck and hired an additional driver for her account.

On August 28, 2006 8:42AM, Felicia Young sent Kimberly Didier of Vital Records an email addressing the Directive and advising her that the service must be discontinued and that they will negotiate any remaining fees owed for their services.

On August 28, 2006 11:39AM, Kimberly Didier sent Felicia an email stating that though they regret the decision made by the VA, they have made necessary expenditures associated with servicing the account, including hiring a new employee dedicated to servicing the account. She indicated that the remaining 58 months of the agreement totals $197,200.00 and rather than the VA pay them "...that kind of money for no services...", they would much rather return to servicing the account. In it she stated that if there is no possibility of restarting the rotation, they are prepared to have a conversation and/or meeting on buying out the contract.

Sometime in September, Felicia Young received a letter from Ray Helbig, GM of Vital Records dated September 6, 2006. The letter stated that Vital Records does not typically negotiate contract termination, but are willing to offer a fair settlement to release James A. Haley VA Medical Center from its contractual obligation and the current unpaid balance of the contract is $200,600.00.

On January 30, 2007 a letter was sent to the attention of Jose Seymour from Fowler White Boggs Banker referencing Breach of Agreement. Fowler White Boggs Banker indicated they have been retained by Vital Records. The letter indicated that on or about August 25, 2006, the hospital informed Vital Records' courier orally, that it would be discontinuing its relationship with Vital Records and suggests a buyout is the only viable solution since it is clear that Vital Records will not be continuing to handle the hospital's storage needs.

On February 24, 2007 an email was sent to Mr. Carl Joseph Coleman of Fowler White Boggs Banker from Karen Mulcahy, Esq. for the Department of Veterans Affairs with an attachment of the IT Directive 06-03. The email discusses their phone conversation on February 22, 2007 and even though services were only used for approximately one month, the VA was willing to offer to pay a sum of $10,200.00 to resolve the matter with their client.

On May 21, 2007 a letter was received at the VA Regional Counsel, Bay Pines, Florida, dated May 17, 2007. The letter was addressed to Karen Mulcahy, Esq. advising her that they were in receipt of her email sent on February 24, 2007 and that $10,200.00 was insufficient to cover the losses that their client incurred. The letter also indicated that, to date, their client has accounts receivable totaling $30,600.00 and demanding payment of that amount. In addition to payment of that amount, they demanded that the hospital informed them how it plans to resolve the outstanding balance of $166,600 under the agreement.

On June 13, 2007, this case was given to Elvis Soler, Contract Specialist at the James A. Haley VA Hospital to make a Contracting Officer's Final Decision based on the information attained.

*Determination*:

FAR Part 1.601 (a) – Career Development, Contracting Authority, and Responsibilities of the Federal Acquisition Regulations states that "Contracts may be entered into and signed on behalf of the Government <u>only by contracting officers</u>." FAR Part 1.602-1 Authority states that contracting officers have authority to enter into, administer, or terminate contracts and make related determinations and findings. Contracting officers may bind the Government only to the extent of the authority delegated to them. FAR Part 1.6 03-2 Selection discusses how the contracting officers are selected based on the complexity and dollar value of the acquisitions to be assigned and the candidate's experience, training, education, business acumen, etc. FAR Part 1.603-3 (a) Appointment states that Contracting Officers shall be appointed in writing on an SF 1402, Certificate of Appointment, which shall state any limitations on the scope of authority to be exercised, other than limitations contained in applicable law or regulation. FAR Part 1.602-3 (a) Definitions describes "Unauthorized commitment" which means an agreement that is not binding solely because the Government representative who made it lacked the authority to enter into that agreement on behalf of the Government.

Felicia Young is not a Contracting Officer. Felicia Young is a Program Support Assistant who is a credit card holder allowed to do Simplified Acquisitions under the Micro Purchase Threshold of $3,000. Felicia Young does not have authority to bind the Government to a five (5) year contract or agreement of any kind that does not fall under her credit card authority. Felicia Young, by signing Vital Records agreement committed an Unauthorized Commitment and as such, voiding any obligation by the Government. It is further evident by the lack of contract format, clauses and provisions which are used in protecting the public whenever Government contracts are awarded by Contracting Officers. Contracting Officers are trained to follow FAR regulations which are developed to protect the public. Clearly, the agreement offered by Vital Records indicates amounts and terms which go far beyond Felicia Young's authority. Felicia Young acknowledged this by her actions when she provided a VA Form 2237 (Request for Services) to Sandra Caraballo so that a purchase order could be generated for services that were above her credit card authority (see Purchase Order 673-C60921).

I agree with Karen Mulcahy, Esq. in that we value our relationships with our contractors and the aid that those relationships provide to our nation's veterans and hope that my decision does not deter any contractors from continuing to provide the valuable aid our veterans are in so much need of. I wish to thank Vital Records for their faithful service to our veterans and I hope that Vital Records continues to provide their treasured service and maintains their readiness, willingness and ableness to serve our veterans in the future.

Claim is denied.

*Closing Statement:*

This is the final decision of the Contracting Officer. You may appeal this decision to the agency board of contract appeals. If you decide to appeal, you must, within 90 days from the date you receive this decision, mail or otherwise furnish written notice to the agency board of contract appeals and provide a copy to the Contracting Officer from whose decision this appeal is taken. The notice shall indicate that an appeal is intended, reference this decision, and identify the case by name. With regard to appeals to the agency board of contract appeals, you may, solely at your election, proceed under the board's small claim procedure for claims of $50,000 or less or its accelerated procedure of claims of $100,000 or less. Instead of appealing to the agency board of contract appeals, you may bring an action directly in the United States Court of Federal Claims (except as provided in the Contract Disputes Act of 1978, 41 USC 603, regarding Maritime Contracts) within 12 months of the date you receive this decision

> The Civilian Board of Contract Appeals, (CBCA) is the authorized representative of the Secretary for hearing and determining such disputes. The address of the Board is 1800 F. Street N.W., Washington, DC 20405.

Elvis Soler,
Contracting Officer

CC: Karen L. Mulcahy, Esq.; Dennis Bleckley; Warren Ector; Carl Joseph Coleman; Ray Helbig; Danny Palo

EXHIBIT 2

VRC

# SERVICE/LEASE AGREEMENT FOR RECORD STORAGE/IMAGING SERVICES

ACCOUNT NO: 15011

CUSTOMER: James A. Haley VA Medical Ctr. EFFECTIVE DATE: July 1, 2006

MAILING ADDRESS: 13000 Bruce B. Downs Blvd Tampa, FL ZIP: 33612

In consideration of Vital Records Control, Inc., and/or Vital Records Control Of Arkansas, Inc., and/or Vital Records Control of South Carolina, Inc. and/or Vital Records Control of Florida, LLC (hereinafter called collectively, "Vital Records") having agreed to provide storage space and/or imaging services (including, but not limited to, imaging, microfilm, microfiche and related services) for a period of sixty months from the Effective Date hereof, the Undersigned (hereinafter called "Customer") agrees to store its magnetic tapes films, microfilms, microfiche, records, documents, or related material ("Materials") in facilities provided by Vital Records. Vital Records agrees to accept the Materials for storage at its facilities, subject to the following agreements, conditions and requirements.

1. RENTAL Customer shall pay Vital Records rent monthly in advance for the term of this contract at a price to be agreed upon based on the volume of items anticipated to be stored as of the date of this Agreement, as set forth in Exhibit A attached, with additional charges to be billed monthly for volume over and above the anticipated amount and for other services which may from time to time be performed by Vital Records at the request of Customer, such charges to be due and payable upon receipt of invoices. All charges under this Agreement may increase by a minimum of five percent at time of extension. A finance charge of one and one half percent per month will be added to any balance not paid within fifteen days from receipt of invoice.

2. OWNERSHIP; WARRANTY All items stored with Vital Records by Customer under this Agreement shall be and remain the property of the Customer and will be returned to the Customer upon written request from Customer. Customer warrants that Customer has full authority to control and store any items stored under this Agreement or under any extensions hereof or amendments hereto, and warrants that Customer will not store items belonging to others except by written agreement with Vital Records.

3. AUTHORITY TO STORE, WITHDRAW OR INSPECT Unless otherwise specified in writing to Vital Records in a timely manner, Vital Records is authorized to permit any employee of Customer to store and/or withdraw Materials. Vital Records shall be indemnified and held harmless by Customer for all such storage or withdrawals of Materials by any employee of Customer, except for gross negligence of Vital Records in the storage or withdrawal of Materials.

4. HAZARDOUS OR ILLEGAL ITEMS Customer agrees that it shall in no event store any materials or substances which are defined as 'hazardous' under CERCLA or other similar federal, state or municipal laws or ordinances or regulations and additionally, shall in no event store any items which are contraband or illegal or otherwise prohibited by applicable law or ordinance nor shall Customer use the facilities for any such purposes.

5. LIABILITY (a) Vital Records shall be liable for loss or damage to items stored or maintained under this agreement only when such loss or damage is due solely to the negligence of Vital Records in which event the liability of Vital Records shall be subject to the following limitations:

In the event the damaged items consist of media excluding paper records, Vital Records liability is expressly limited to replacement of the media which is damaged or destroyed without any consideration or value whatsoever given to any data or information which may be stored on said media.

In the event the damaged items consist of boxes of paper records, Vital Records shall have no liability for claims, loss or damage, alleged or incurred as a result of or attributable to the data or information which may be contained in such paper records.

In no event shall Vital Records be liable for costs or damages relating from: (a) lost business; (b) inability to collect accounts receivable, (c) retrieving, locating or recreating data: or for any special, consequential or punitive damages; or any other costs of any nature whatsoever resulting from the loss, destruction or misdirection of any item stored under this Agreement.

In no event shall Vital Records be liable for loss, damage or destruction resulting from natural deterioration of the items stored under this Agreement, whether from the maintenance performed by Vital Records or otherwise, or from acts of God, strikes, labor disputes, acts of government, riots, or other causes beyond the control of Vital Records;

In no event shall Vital Records be liable for loss or damage resulting from or associated with incorrect inventorying, deterioration, or mutilation of items not inventoried or packaged for storage by Vital Records.

In no event shall Vital Records be liable for damage noted on its rental receipts, maintenance receipts or for loses due to or resulting from such damages or defects.

Any claims against Vital Records must be in writing and must be received by Vital Records within fourteen (14) days after withdrawal of affected items; otherwise, Vital Records shall not be liable whatsoever with respect to such property.

The Customer acknowledges that Vital Records presently has in effect and shall maintain casualty and extended coverage insurance covering loss or damage to the Customer's property incurred as a result of the negligence of Vital Records in an aggregate amount of at least $250,000.00 per casualty. Customer acknowledges and agrees, by execution of this agreement that the liability of Vital Records for claims, loss or damage incurred by Customer as a result of a casualty involving damage to Customer's property shall in no event exceed and is expressly limited to the available insurance proceeds, irrespective of the number of Customers claiming entitlement to such insurance proceeds or the adequacy or availability of such insurance proceeds and Customer shall look solely to the insurance proceeds to recover such losses, howsoever caused.

6. WAREHOUSE RECEIPTS Customer understands that Vital Records is not a public warehouse and does not issue "warehouse receipts." Any rental receipts issued by Vital Records will be non-negotiable.

7. DELIVERY AND REMOVAL Vital Records may agree from time to time to transport items stored under this Agreement to or from its facilities for Customer or Customer's designee if so requested by Customer, at rates to be determined. All references herein to the limitations on Vital Record's liability for items stored under this Agreement shall be applicable whether the alleged damage or loss occurs while the items are in storage in Vital Record's facilities or in the process of being transported to or from such facilities. All packing material and containers must meet the systems specifications required by Vital Records. Moreover Vital Records shall not be liable for any damages whatsoever, of any kind or nature, resulting from or arising out of the failure or omission to make timely pick-up, or delivery of such items or the failure of omission to perform any such service. Additionally, Vital Records shall charge a permanent removal fee in the amount of three dollars per item in addition to other applicable charges in the event any items are removed from the Vital Records system (excluding destruction). All charges for such transporting will be billed monthly and payable upon receipt of invoices by Customer.

8. DEFAULT & TERM OF AGREEMENT In the event that Customer fails to pay rent or other assessments due hereunder to Vital Records or otherwise violates any covenant, condition or provision set forth in this Agreement, such actions constitute a default under the terms of this agreement. In the event of default Customer shall pay all costs of collection or enforcement of the terms of this Agreement, including reasonable attorney's fees. All installments remaining for the term of this contract, at the option of Vital Records without demand or notice, shall immediately become due and payable, upon default of the Customer to the terms of this contract. The term of this Agreement shall be as above noted, and it shall be automatically extended for successive terms of sixty months. The Agreement may be terminated at the expiration of the initial term or at the expiration of any successive term by either party upon written notice, sent by certified mail, which is received by the other party at least ninety days prior to the expiration of the term.

9. ITEMS HEREAFTER ADDED All terms and conditions of this Agreement shall apply to any items now or hereafter stored at Vital Records by Customer.

10. CONFIDENTIALITY Vital Records and Customer agree to keep the terms and conditions of this Agreement confidential between the parties and not to disclose the terms and conditions of this Agreement to unrelated third parties. Inventory systems, bar coding and other material handling and storage procedures for Materials are proprietary property of Vital Records, and Customer agrees not to disclose any such information it may receive relative to storage of Materials with Vital Records to unrelated third parties.

11. AMENDMENTS All amendments, supplements, modifications, or waivers relative to this Agreement must be in writing and duly signed by authorized representatives of Customer and Vital Records.

12. ENTIRE AGREEMENT Except as herein provided, this Agreement is the entire Agreement between Vital Records and Customer, and supersedes all previous agreements between them with respect to the subject matter hereof.

CUSTOMER [signature] VITAL RECORDS

By: [signature] 7/3/06 Date By: [signature] 6/30/2006 Date

VITAL RECORDS

Vital Records and Customer hereby certify that all property stored under this Agreement has been withdrawn and is in the care and custody of Customer, and this Agreement is hereby no longer in force.

CUSTOMER ______________ VITAL RECORDS

By: ______________ By: ______________

Date: ______________ Date: ______________

122004

# EXHIBIT A

Attached and made a part of contract dated 7/1/2006, between VA Medical Center Tampa, Fl (VA) and Information Vaulting Services, Inc. dba Vital Records Control of Florida, LLC ("IVS").

STANDARD QUARTERLY FEE: $10,200

* Billing from July 1, 2006 through September 30th, 2006

This standard fee includes:

1. The right to store up to one hundred twenty tapes per month at IVS.
2. All access charges on rotating up to sixty tapes per day in and out, five days per week
3. One round-trip delivery each day, five days a week (Monday through Friday 11am-4:30pm.
4. Forms and customer labels as needed.
5. Storage requirements are:
   a. Waterless Fire Protection
   b. Humidity/Climate Control
      - Humidity: 45% - 50% range
      - Temperature: 65 – 75 Fahrenheit range

---

All additional charges will be billed on a monthly basis:

1.) Every tape stored above one hundred twenty will be one dollar fifty cents per tape per month.

2.) For additional tapes rotated above the sixty in and sixty out each day the charge will be one dollar and fifty cents in or one dollar and fifty cents out.

3.) Additional deliveries, Monday through Friday, 9am to 5pm, will be one hundred fifty dollars plus access fees if four hour notice is given to IVS staff.

4.) Emergency deliveries, when two (2) hour notice is not given or during the hours of 5pm to 9am, will be two hundred dollars plus access fees.

5.) Any manual inventory that is necessary for media operations will be performed at a rate of fifty cents per item.

IVS will provide containers to be used for transporting media. VA will be responsible for the condition of said containers ordinary wear and tear accepted. These containers must be returned to IVS upon termination of attached lease and may not be used for any purpose other than rotation of media between VA and IVS.

[signature] 7/3/06 [signature] 6/30/2006

SFBC, Inc Date Information Vaulting Services, Inc. Date

# EXHIBIT A

Attached and made a part of contract dated 10/1 /2006, between VA Medical Center Tampa, Fl (VA) and Information Vaulting Services, Inc. dba Vital Records Control of Florida, LLC ("IVS").

STANDARD QUARTERLY FEE: $40,800

* Billing from October 1, 2006 through September 30th, 2007

This standard fee includes:

1. The right to store up to one hundred twenty tapes per month at IVS.
2. All access charges on rotating up to sixty tapes per day in and out, five days per week
3. One round-trip delivery each day, five days a week (Monday through Friday 11am-4:30pm.
4. Forms and customer labels as needed.
5. Storage requirements are:
   a. Waterless Fire Protection
   b. Humidity/Climate Control
      - Humidity: 45% - 50% range
      - Temperature: 65 – 75 Fahrenheit range

---

All additional charges will be billed on a monthly basis:

1.) Every tape stored above one hundred twenty will be one dollar fifty cents per tape per month.

2.) For additional tapes rotated above the sixty in and sixty out each day the charge will be one dollar and fifty cents in or one dollar and fifty cents out.

3.) Additional deliveries, Monday through Friday, 9am to 5pm, will be one hundred fifty dollars plus access fees if four hour notice is given to IVS staff.

4.) Emergency deliveries, when two (2) hour notice is not given or during the hours of 5pm to 9am, will be two hundred dollars plus access fees.

5.) Any manual inventory that is necessary for media operations will be performed at a rate of fifty cents per item.

IVS will provide containers to be used for transporting media. VA will be responsible for the condition of said containers ordinary wear and tear accepted. These containers must be returned to IVS upon termination of attached lease and may not be used for any purpose other than rotation of media between VA and IVS.

[signature] 7/1/06 [signature] 6/30/2006

SFBC, Inc Date Information Vaulting Services, Inc. Date